# AFFIDAVIT

I, Glenn Hester, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18.

2. I have been a sworn member of the BPD since February, 1986. I am currently assigned as a TFO with the DEA's TDS in Baltimore, Maryland. The DEA TDS investigates criminal violations related to the diversion of pharmaceutical controlled dangerous substances and prescription medications.

3. I have participated in numerous investigations of unlawful drug distribution involving the use of undercover officers, confidential informants, undercover transactions, physical surveillance, telephone toll analysis, investigative interviews, the execution of search warrants, and the recovery of substantial quantities of narcotics, pharmaceutical controlled substances, proceeds, and related paraphernalia. I have reviewed taped conversations, as well as documents and other records relating to controlled dangerous substance ("CDS") trafficking and money laundering. I have interviewed people familiar with the drug business, including drug dealers, users and confidential informants, and have discussed with them the lifestyles, drug appearance terminologies, and habits.

4. Through my training, knowledge and experience, I have become familiar with the manner in which illegal drugs are transported, stored, "stashed," manufactured, and distributed. I am also aware that drug traffickers often possess and use firearms, and the methods by which CDS traffickers collect, and conceal, the proceeds of their illegal activities. I have also become familiar with the manner in which CDS traffickers use telephones, cellular telephone technology, and pagers. I am also familiar with the use of coded or slang-filled communications by those involved in drug trafficking, and their use of false or fictitious identities. I am also aware that drug traffickers often use text messaging, Direct Connect/Dispatch Services and other means to facilitate their illegal activities and hamper law enforcement investigations.

## II. PURPOSE OF AFFIDAVIT

5. On February 14, 2019, David Anthony ROBINSON (DOB: 11/14/1968) was arrested on probable cause that he violated Title 18 U.S.C. § 3147 (Commission of a Crime while on Release), Title 18 U.S.C. § 1513 (Retaliating Against a Witness), and Title 18 U.S.C. § 1958 (Murder for Hire).

### III. BACKGROUND

6. David Anthony ROBINSON was a registered pharmacist in the state of Maryland. ROBINSON was licensed by the Maryland Board of Pharmacy to practice pharmacy on August 7, 1996 and that license was suspended on August 7, 2017. From January 2016 to July 2016 law enforcement used a confidential source ("CS-1") to make several controlled purchases of Oxycodone and Alprazolam from ROBINSON at his pharmacy Frankford Family Pharmacy located at 5422 Sinclair Lane, Baltimore, Maryland 21206.

7. On June 22, 2017, a Federal Grand Jury in the District of Maryland indicted ROBINSON on one (1) count of conspiracy to distribute and possess with intent to distribute Oxycodone and Alprazolam, in violation of 21 U.S.C. § 846, and eight (8) counts of distribution of Oxycodone and Alprazolam, in violation of 21 U.S.C § 841 (a)(1), and 18 U.S.C § 2.

8. On June 27, 2017, law enforcement officers arrested ROBINSON. On June 29, 2017, ROBINSON was released from custody and has been monitored by pre-trial services.

9. On October 10, 2018, ROBINSON plead guilty to one (1) count of conspiracy to distribute and possess with intent to distribute Oxycodone and Alprazolam, in violation of 21 U.S.C. § 846, and one (1) count of distribution and possession with intent to distribute oxycodone and alprazolam, in violation of 21 U.S.C. § 841. He was continued on conditions of release and his sentencing was scheduled for February 15, 2019.

### IV. DRUG OFFENSES WHILE ON RELEASE

#### A. Law

10. Maryland Criminal Code § 5-701 provides that "A person may not dispense a prescription drug except … on an authorized provider's … written prescription…" and provides criminal penalties of up to 2 years imprisonment and a fine not exceeding $1,000.

11. 18 U.S.C. § 3147 provides for a consecutive sentence of imprisonment of up to 10 years (if a felony) and up to 1 year (if a misdemeanor) for anyone "convicted of an offense committed while released under this chapter."

#### B. Facts

12. On October 27, 2018, Police Officer Corey Meiler of the Baltimore Police Department's Eastern District was monitoring the Citi-Watch camera system located near the intersection of E. North Avenue and Belair Road, in Baltimore, Maryland. This area is a high drug trafficking area and is noted for the sale and distribution of pharmaceutical controlled substances and prescription medications. During the surveillance officer Meiler saw what he believed, based on his training, knowledge, and experience, to be a drug transaction between two individuals. Officer Meiler contacted police units in the area and provided police units with information, to include a description and location of travel of a vehicle believed to be involved in the drug transaction. Officers stopped the vehicle and arrested the operator. Officers recovered from the trunk of the vehicle a DTLR shoe bag containing one (1) shoebox containing a cardboard box containing twenty-three (23) stock pharmacy bottles. Each bottle contained one hundred (100) tablets of Promethazine, a prescription medication, totaling two thousand three hundred (2,300) dosage units. Another

shoebox contained a cardboard box with twelve (12) stock pharmacy bottles. Each bottle contained one hundred (100) tablets of Clonidine, a prescription medication, for a total of one thousand two hundred (1,200) dosage units.

13. Based on your Affiant's training, knowledge and experience, I know that Promethazine is used for the treatment of nausea and Clonidine is used to treat high blood pressure. Neither are controlled substances but both require a prescription. I also know that these types of pills are commonly diverted and sold and purchased on the street near facilities that provide treatment for opioid addiction.

14. CS-2 agreed to cooperate with law enforcement and told Officer Meiler that he/she had obtained the prescription medications from ROBINSON. CS-2 explained that he/she has known ROBINSON for approximately three (3) years. CS-2 previously purchased Percocet, Xanax, Clonidine and Promethazine from ROBINSON at the Frankford Family Pharmacy. Initially, CS-2 recruited individuals to go into the Frankford Family Pharmacy using various names to get pills from ROBINSON. Eventually, ROBINSON wanted to meet the "writer" of the prescriptions and CS-2 started dealing with ROBINSON directly. According to CS-2, a trust was established and ROBINSON told CS-2 to create bogus names for the prescriptions. ROBINSON charged CS-2, $60.00 for ninety (90) tablets of Xanax; $180.00 for sixty (60) tablets of Oxycodone; $25.00 for a bottle of Clonidine tablets; and $30.00 for a bottle of Promethazine tablets. CS-2 visited ROBINSON at the Frankford Family Pharmacy several times a week to get medications and would re-sell these for a profit. CS-2 reported that after the pharmacy was raided (June 27, 2017) ROBINSON began providing CS-2 with case lots or boxes of medications in exchange for cash and no prescription was required.

15. CS-2 reported that after the Frankford Family Pharmacy was raided, CS-2 and ROBINSON met. ROBINSON told CS-2 to get rid of any evidence pertaining to the pills. CS-2 reported that ROBINSON continued to sell Promethazine and Clonidine and that six months after the raid ROBINSON was still ordering pills from his vendors.

**1. Controlled Purchases**

16. On December 13, 2018, CS-2 made a controlled purchase (at the direction of law enforcement) from ROBINSON at TGI Fridays located at 2435 Liberty Heights Avenue, Baltimore, MD 21215. CS-2 purchased forty-eight (48) stock pharmacy bottles containing one hundred (100) tablets each of Clonidine, totaling four thousand eight hundred (4,800) dosage with $1,200 in DEA Official Advanced Funds ("OAF"). CS-2 did not provide (and ROBINSON did not request) a prescription for these pills.

17. On January 24, 2019, CS-2 made another controlled purchase (again at the direction of law enforcement) from ROBINSON at TGI Fridays located at 2435 Liberty Heights Avenue, Baltimore, MD 21215. CS-2 purchased twenty four (24) stock pharmacy bottles each containing one hundred (100) tablets of Promethazine 50 mg, totaling two thousand four hundred (2,400) dosage units and forty eight (48) stock pharmacy bottles each containing one hundred (100) tablets each of Clonidine 0.3 mg, totaling four thousand eight hundred (4,800) dosage units with $1,920 in DEA OAF. CS-2 did not provide (and ROBINSON did not request) a prescription for these pills.

18. On February 7, 2019, CS-2 made another controlled purchase (again at the direction of law enforcement) from ROBINSON at TGI Fridays located at 2435 Liberty Heights Avenue, Baltimore, MD 21215. CS-2 purchased twenty two (22) stock bottles of Clonidine, totaling two thousand two hundred (2,200) dosage units with $600 in DEA OAF. CS-2 did not provide (and ROBINSON did not request) a prescription for these pills.

## V. WITNESS RETALIATION AND MURDER FOR HIRE

### A. Law

19. 18 U.S.C. § 1513(a) provides for criminal penalties of up to 30 years for: "Whoever ... attempts to kill another person with intent to retaliate against any person for—(A) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or (B) providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings..." 18 U.S.C. § 1513(f) also provides for the same penalties for "[w]hoever conspires to commit any offense under this section...."

20. 18 U.S.C. § 1958 provides "[w]hoever ... uses or causes another (including the intended victim) to use ... any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both."

### B. Facts

21. CS-2 also told law enforcement that, in the period after his arrest, ROBINSON mentioned the name of an individual that ROBINSON believed had cooperated with law enforcement and led to his arrest (CS-1). ROBINSON told CS-2 that "Jokers got to go." CS-2 interpreted "Jokers got to go," to mean that ROBINSON wanted to kill CS-1. According to CS-2, ROBINSON asked CS-2 to assist in the murder of CS-1. CS-2 reported that ROBINSON provided CS-2 with information from the Maryland Judiciary Case Search website regarding CS-1 because CS-2 did not know CS-1. Based on the information provided by ROBINSON, CS-2 recruited a friend to get a photograph of CS-1. ROBINSON asked CS-2 to get a Motor Vehicle Administration (MVA) photograph of CS-1, which CS-2 was able to acquire through a friend that worked at the MVA. CS-2 told investigators that he/she did not know of anybody that could kill CS-1 but saw a chance to make some money from ROBINSON. CS-2 told ROBINSON that he/she knew someone that could do the "hit." CS-2 told ROBINSON that the fee would be $10,000.00 -- $5,000.00 up front and $5,000.00 when CS-1 was killed. CS-2 reported that ROBINSON provided CS-2 with $5,000.00, which CS-2 deposited into a bank account and used to pay bills. CS-2 estimated the money exchange occurred in late 2017. According to CS-2, as time passed, ROBINSON regularly questioned CS-2 about the progress. CS-2 often made excuses and would tell ROBINSON that CS-1 was hard to locate.

22. During the January 24, 2019 controlled purchase, CS-2 and ROBINSON discussed the murder of CS-1 (which was recorded). The following are excerpts from that recorded

conversation:

- CS-2 - "Yeah, yeah man. I got some good news, and not so good news."
- ROBINSON - "You found that mother fucker."
- CS-2 - "Alright, yeah. My man, his homeboy, one-hundred percent, one hundred-percent."
- ROBINSON - "yeah."
- CS-2 - "Guarantee, guarantee, he wants, he wants two-thousand dollars."
- ROBINSON - "Two thousand! I already gave the mother fucker five."
- CS-2 - "Yeah that's what I'm saying, that's the half up front, and the other half when it's done, but I'm saying, for he, he, I mean, that's what he wants."
- ROBINSON - "So he wants thirteen?"
- CS-2 - "No. I mean, he want, no, the one who's doing it."
- ROBINSON - "Oh, it's a different person."
- CS-2 - "His homeboy, I mean, he got him working, you known what I mean?"
- ROBINSON - "Uh hunh."
- CS-2 - "So, I sayin', he wants, I guess he's trying to get something out the deal, too."
- ROBINSON - "So he wants two thousand?"
- CS-2 - "One hundred percent, I mean his word is good, so."
- ROBINSON - "Alright, so."
- CS-2 - "But I mean, he knows where he lives at, he didn't tell me. He said Glen Burnie somewhere."
- ROBINSON - "Why can't we just go with the first mother fucker, for ten thousand?"
- CS-2 - "I mean, I guess the dude, whoever he hooked up with, he's trying to get some money out of the deal, you see what he's saying?"
- ROBINSON - "Yeah ... So really the shit right now ain't doing me no good?"
- ROBINSON - "So, if they can do it for ten, you know, you still owe me five and a two, right?" (Your Affiant believes this was referring to CS-2 owing ROBINSON for five (5) boxes of Clonidine and two (2) boxes of Promethazine.)
- CS-2 - "for the pills, (Unintelligible) yeah I know."
- ROBINSON - "That's like forty-five."

Later in the conversation:

- CS-2 - "So, what you want me to tell him? I mean what you want, how do you want me to do that?"
- ROBINSON - "Just let me hold off for a minute, cause I got stacks of money to get these bills right. I don't want to pay no more money right now."
- CS-2 - "I mean, I'll see if I can talk him down, like look, it's important man, I mean give him some of what something, I mean, we got to figure something out, I mean."
- ROBINSON - "I'm like, I already paid one mother fucker five, and he ain't done shit, got me waiting, God damn, a whole year."

23.   Your Affiant believes based on his training, knowledge and experience, that the above

conversation between ROBINSON and CS-2, though coded at times, was a discussion that involved the location of CS-1, the mention of a fee of five thousand dollars that was already paid to the person that was supposed to murder CS-1, and another two thousand dollars to be paid to an associate of the purported murderer. CS-2 indicated that this associate is the person who actually knows where CS-1 is residing and even though he was an associate of the person that was originally hired to do the murder, this associate was not going to provide the residence of CS-1 to the person doing the murder, unless he also received a fee. In this conversation, ROBINSON was upset over this additional fee required to identify the location and accomplish the murder of CS-1.

24. On February 4, 2019, at approximately 10:30 a.m., your Affiant and Officer Corey Meiler met with CS-2 at an undisclosed location in Baltimore. At approximately 10:57 a.m., CS-2 sent a text message (using his cell phone) to ROBINSON (at his cell phone): "My mom coming home from the hospital tomorrow but I need 2 orange Thursday and I took care of that $3000 for his address we can talk more about when u see you." At approximately 11:41 a.m., ROBINSON replied "Alright bruh....I wouldn't have given him that dough though." CS-2 replied "Why not" and "damn." ROBINSON responded, "Because he already agreed to one price that we agreed to.....now its like he got a subcontractor and we paying them both." CS-2 wrote, "Naw this dude got [CS-1's] address." ROBINSON then wrote, "I'll talk to you on Thursday." CS-2 replied, "Cool."

25. During the February 7, 2019 controlled purchase, CS-2 and ROBINSON had a recorded conversation regarding the murder of CS-1. The following are excerpts from that recorded conversation:

- ROBINSON: "[Inaudible] You told me you gave the guy the three".
- CS-2: "Oh."
- ROBINSON: "Three G's"
- CS-2: "Oh yeah. Man, you saying I shouldn't have gave it to him. Ha."
- ROBINSON: "That's like they hustling us, man. The man told me ten."
- CS-2: "Yeah, but I mean, I don't think he's hustling, but I mean, that's a cheap price though, for real. He can charge more for that, you see what I'm saying? And he's talking [Unintelligible] like the homeboy says, that's why he's giving that price. You know what I mean?"
- ROBINSON: "Right. I mean, since you already paid him, it's like, I was saying, it's like, I gave him five of the ten, then he's like, pay us five. And the homeboy, I know where he's at, but I need three."
- CS-2: "No, I mean, I'm like, like, that's what he wanted. You know what I mean."
- ROBINSON: "Yeah"
- CS-2: "So,"
- ROBNSON: "I was thinking more like, fuck it. I mean, it really doing me no good now."
- CS-2: "Yeah, that's true"
- ROBINSON: "Know what I mean? It's like a, fuck, retribution now. Fuck, so, we'll see."
- CS-2: "I mean, to be honest with you, the dude, I know, I mean, like I mean."
- ROBINSON: "he's been laying low"
- CS-2: "Yeah, I don't have, I don't have the five thousand to give him, so I mean, so how do

you feel about, like he wants to make sure he gets the rest of his money, you know what I mean? How do you feel about meeting him, [Inaudible] to make sure you supervise him and you'll get to know him. I mean,"
- ROBINSON: "Myself, huh?"
- CS-2: "I mean, I,"
- ROBINSON: "[Inaudible] I mean,"
- CS-2: "I mean, I don't have the five thousand dollars to give him, so, I don't have that at all. Trying to move and shit. I got bills and shit, bills."
- ROBINSON: "[Inaudible]"
- CS-2: "I don't know! I don't know, he, I think, I think, because I gave him the money, so, that's what I'm telling, I don't know, you got that up front, I don't know, I mean you got paid like up front, you know what I mean?"
- ROBINSON: "Yeah."
- CS-2: "Know what I mean? He didn't understand, he's laying now, I guess he couldn't find him, but then I got some [Unintelligible] good news, like man, I mean, he's located, I mean his man located him, so you know, I just,"
- ROBINSON: "[Inaudible] You don't need to be following me."
- CS-2: "Alright, well, I'll just don't, see, I mean, he'll take my word, far as he won't. See, I owe you for the other, too"
- ROBINSON: "Right."
- CS-2: "I ain't gonna have five thousand dollars, understand, he don't want that stuff, he's gonna want his money. I don't have five thousand to give him."
- ROBINSON: "[Inaudible]... I probably, I can get a whole stack."
- CS-2: "Okay, alright"
- ROBINSON: "I'm saying, this thing is like fuck it, almost!"
- CS-2: "He don't give a shit, you gonna take the hit, the loss? That's a lot of money. I mean, it's up to you, but I'm just saying, like, that's a call you have to make. So cold, you [Inaudible] you still there?"
- ROBINSON: "Yeah. I won't be home until eight. If you can deal before then, I got five. If not, then fuck it."
- CS-2: "Alright, April now? I thought it's in March."
- ROBINSON: "I got to go to court on the fifteenth, but to,"
- CS-2: "Oh yeah,"
- ROBINSON: "Then I got forty-five days after that. April, February's a short month. It's gonna run into April."
- CS-2: "Okay, alright. Okay, alright."

26.     On February 14, 2019, CS-2 made a call to ROBINSON and told ROBINSON that the thing was done and that the guy would want his money. CS-2 then met with ROBINSON.

27.     According to CS-2, ROBINSON provided CS-2 with $2,000, which CS-2 put in his pocket. ROBINSON asked the CS-2 for proof that the murder had been completed. CS-2 showed

−7−

ROBINSON several photos that were mocked up to appear to show CS-1 dead. ROBINSON indicated that the person in the picture was the right person.

28. After that meeting, law enforcement arrested both ROBINSON and CS-2.

## IV. CONCLUSION

Based upon the above facts, I believe there is probable cause to believe that ROBINSON violated Title 18 U.S.C. § 3147 (Commission of a Crime while on Release), Title 18 U.S.C. § 1513 (Attempted Retaliating Against a Witness), and Title 18 U.S.C. § 1958 (Attempted Murder for Hire).

TFO Glenn Hester
Drug Enforcement Administration

SUBSCRIBED and SWORN before me this 15th day of February, 2019.

Stephanie A. Gallagher
U.S. Magistrate Judge – District of Maryland

—8—